Thank you, Your Honor. It pleases the court. I'm Tim Ford, representative of Rawson. Mr. Rawson was the appellant here. He was the plaintiff below. He claimed that his rights were violated. His constitutional rights were violated by the Senate in three different ways, different things that they did because he was deprived of his liberty and violently integrity for five days. Now, Mr. Ford, can you hold on one second? I'm going to ask our tech people. I don't know about my colleagues, but you're breaking up. Can the rest of you hear Mr. Ford? I'm wondering if the microphone may be a little far away or something. I'm sorry, Your Honor. Can you hear me now better? I'm clear. That's better. That's better. I apologize. Go ahead. Thank you. I was saying Mr. Rawson claimed to have had his constitutional rights violated three different ways by three different things that these defendants did. And he claimed that all of those things occurred under color of state law. That's the issue in this case. This court has said that analyzing whether conduct of ostensibly private parties is under color of state law, it's important to focus on civic conduct that is being challenged. I think that wasn't done well enough below, and that's one of the reasons why we're here. Rethink the thinking he's made constitutional claims about were first, going along with a prosecuting attorney that was assigned to them by statute, these defendants obtained orders that had him locked up for these 55 days, actually could have gone longer, but they finally did release him. Second, they physically confined him. They ran the facility where he was locked up behind lock and key, just like in a private jail or prison. They did that separately from their action of applying to the court for the orders. And then third, they were responsible for his medical care during the time when he was locked up. And addressing this color of law issue, I'd like to start from the end, from the third one, because it's the simplest, there's a Supreme Court of the United States case that is directly on point, West versus Higgins, that holds that when private companies and private doctors go into facilities, jails, and prisons, where people are held against their will, that they are engaged in a public function and they are acting under color of state law, because the government has an obligation to provide medical care to those people who it's locked up and deprived of their ability to get medical care on their own. These doctors were providing medical care to Mr. Bronson, medical care that we think was them, the medical care that the district court held was sufficiently agreed to have a medical malpractice. And by doing that, they were doing exactly what the doctors in West versus Higgins were doing and exactly what the company in West versus Higgins was doing. I confess when I was going through this case, I got factually confused, which was revealed to me when I talked to my law clerk about it. So let me make sure I have a handle on it now. And in particular, it's the reference to West and the contract in that case with, I guess, a state or state prison. What's the contract with a governmental institution here that should cause us to treat the defendant in this case the same way as the defendant in the West case? Well, the contract was with Optum, which is an agency that works with Pierce County to fulfill the obligations under the Involuntary Treatment Act. You do the three things we're talking about. Well, but that's exactly where I got confused because I didn't internalize that, and it turns out that the events in question here took place not in Pierce County, but in Clark County, which is some distance away. Is that correct? He was initially picked up in Clark County, but he was transferred to the facility in Pierce County, which is where the defendants operate on the actual grounds of the Western State Hospital. Yeah, but there they are. They're a privately owned facility that happens to rent some space. A lot of people do that in a public building, and you want to call them a state actor. Well, I want to focus on the specific things that they were doing. One was they were providing medical care. The state was obligated to provide Mr. Rawson because he was locked up under court order. That's what West v. Aitken said. Anybody who does that is performing a public function. They are doing the job of government for the government, and West v. Aitken, I think, controls by itself, apart from the other things that they were doing. The other things that they were doing were also public function of holding, of having essentially a private prison or jail, and we cited a case that we sent in an additional authority. I'm sorry, it was a little late. In this court, we cited below a Halverson case where this court held that a facility that holds people involuntarily for treatment for alcoholism, acting under color of state, not entitled to qualified immunity, under a case called McKnight v. Richardson, because they're doing the same thing. Mr. Ford, you're saying that any privately owned hospital that accepts a person under a court order is operating under a state function. Therefore, they're a state actor. Well, in Washington state, only these kinds of rehabilitation facilities and evaluation facilities can do that. No other private hospital can do that. It's only done by these specific actors that are qualified and given these special powers to do what the state is required to do once it's determined that a person is a danger to themselves or others by a court. The state has to provide a place for those people to be defined. Traditionally, it does so in its own hospitals, in that regulated and designated areas where they do that job for the state, but it's not just any other hospital, no other hospital can do this, no regular hospital can do this. Well, actually, there are lots of hospitals. I mean, there are other facts that differentiate different cases, but it's not uncommon for somebody to be picked up and taken by law enforcement to a hospital for an immediate decision as to what to do with this person. And it sounds like you're saying that if a hospital takes that person in, whammo, they're a state actor. No, we've said exactly the opposite of that, Chief Lipton. We did not make a claim about that occurring in this state, in this case. That's the difference. All the cases that the defendants have relied on here deal with that kind of a situation, it was after he was picked up, after he was evaluated, and after he was sent to the facility, and then a court order was entered saying he would be confined, not just evaluated. This court said in the Jensen case, evaluation is not necessarily a public function, but housing and confinement for extended periods of time, months here, that is a public function, always has been. There's no case that has authorized states to do this or private individuals to do this and get out of the act under color of state law. Do you think the public function test is your best argument? There is a, you know, there's the joint action close nexus test. That's correct. There's that. And again, we have to focus on the specific conduct. In the medical, providing medical care, they're doing a public function. That's what West holds. In doing a, holding a private jail and a private confinement facility, they're doing a public function. That's what this court has said in Halverson and in the Apollo versus CEO. That's a public function to have a public jail or a private jail or a prison. The third thing that they've done, and actually the first chronological, participate with the prosecuting attorney in this evaluation. And that's what the district court got stuck on and didn't actually notice the public function that was being performed on the back end. I agree on the evaluation portion and the obtaining of the orders to confine Mr. Rawson, that the strongest argument there is Texas, because they were working really unparalleled in any of the cases, hand in hand with a prosecuting attorney who represented them and who is referred to as the state. We put in another additional authority of a statute that says these people and their assigned prosecuting attorney are the state in these confinement proceedings, 12 day and then the 90 day. And that's what they were doing. And they were doing it with the prosecuting attorney by virtue of a statute that said that they had this special staff, nobody else, no private individual can go to court with a prosecuting attorney in the state. Only these people, because they're performing that function that the state of Washington, even though that isn't necessarily a public function, always when you do it in hand in hand with the prosecuting attorney who's paid by the county of Washington to represent the state, you do it in a proceeding which state statutes say they are the state that is in state action. Along that line, would you address this question? I was struck by the fact that prior, and I don't remember what the date was, but prior to a particular date, the state of Washington performed all these functions, there was no private actor out there on the scene, but then the law got changed and when the law got changed, you have a situation like we have in this particular case and your judgment does the language of the statute that was made connecting with this change have any bearing on how we look at the role that these people play vis-a-vis the state? Yeah, I'd say yes. The statute we put in the additional authority 7105237 says that these people are the state and the court has to make a determination if it doesn't follow what they want of whether the state has met their burden. That's who they are because they're there in front of the court. Pierce County Superior Court represented by a Pierce County prosecuting attorney and they have that status by virtue of a statute that gives only them that. Does it make any difference that the supervising physician, I guess he was a physician in this facility, was also an employee of the state at the hospital? I don't know. Does that make any difference? I think it's a factor. It's not a crucial factor. He was getting paid an enormous amount of money to work part-time supposedly. We have factual questions as to what his involvement was in terms of color of state law. The color of state law comes from the public function of treating confined inmates, the public function of confining people who are thought to be dangerous, and the nexus between them and the prosecuting attorney in seeking the orders to authorize him to be locked up. Three different things. They're all under color of state law. Is your argument of being under color of state law as strong as to the 14-day detention? Yes. I don't know that there's any difference there. He was detained under locked and key. He was forcibly medicated and treated. He couldn't go out and get his own doctor. He was dependent on them for medical care. He couldn't leave that facility without being arrested. He was just like a prisoner. That's color of state law. I'd like to reserve some time for this discussion. Please. You may do so. Thank you. Very well. Mr. Justice? Your Honors, may it please the court, Benjamin Justice for the defendants and appellees. Judge, judges, the basic function of, let me back up. There's a presumption here that these private actors are not state actors. And they will be deemed to be state actors only in rare circumstances. Why? Why is there that presumption? It's under the law. Under the, it's right at the top of our brief. If you want me to cite it, I can. Well, I think it varies depending upon the function. I mean, we know in the prison doctor case, for example, the state can't immunize itself or immunize doctors at higher simply by privatization. And I'm not sure the statement that you've started with should be taken quite as broadly. You've acknowledged their exceptions. You've characterized them as rare, but I think it matters depending upon what the activity actually is. Yes, Judge. Let's talk about what their function was. Their function was not to run a prison. Their function was not to run a state hospital or county hospital. Their function was as an evaluation and treatment facility as defined by the Involuntary Treatment Act. They evaluated and they treated. That's what they did. They did not have any quote constitutional obligation to provide evaluation and treatment services. That wasn't what they were doing. That wasn't what they were established to do. And as was pointed out earlier, this has always been the case that they've allowed these facilities to operate and they've allowed private actors to operate them and they've drawn a distinction in the law between public and private agencies in doing so. But in terms of the function, could Mr. Rawson walk away? He could not walk away, but a lot of this, I think what's lost in a lot of this discussion is the role of the superior court. And in this sense, the case is quite different from Jensen. We had no ability to enter a quote order to detain him. In our case, he was detained first by order of the county designated mental health professional. And there's no evidence that we had any cooperation or interaction with that person. And then he was subsequently detained by order of the superior court. And we know under Dennis versus Spark, for us to simply go to the court with a petition seeking that he be involuntarily committed for further evaluation treatment, that does not give rise to state action. So it's not the petition and it's not the evaluation of treatment. Now, as far as these references... Wait a minute, if I understand the record correctly, your client met with the county prosecutor to try to decide how best to deal with Mr. Rawson's intention to file a lawsuit. They were concerned he wanted a trial. It kept getting postponed. They worked some kind of a deal. That sure doesn't sound like a private enterprise to me. Didn't one there just a deal between the county and your clients to try to get Mr. Rawson's lawsuit out there back? No, the prosecutor had no involvement in this lawsuit. And the discussions... No, I understand. I understand that because it got dropped. He got released. He wanted to be released. He wanted a jury trial and the prosecutor was very much involved. He had threatened the lawsuit. And at some point there, your client and the prosecutor talked about this, what to do with this guy because he wanted to be released. They were concerned perhaps about liability. I don't know for sure, but there's at least that in the record. Is there not? They certainly communicated with the prosecutor, which they had to do as a function of the law, whether they were private or public, the law didn't allow them to use a different attorney to consult regarding the petition. However, prosecutor didn't draft the petition and he certainly was not part of any mental health team that formulated the judgments, the medical judgments that led my clients to make the decisions they did regarding evaluation and treatment and whether release was safe or appropriate. So he was acting as an attorney by law to handle the petition. And he communicated with Mr. Rawson's attorney, but he had no, he had no involvement whatsoever in the underlying medical judgments that led my defendants to determine whether or not it was safe for him to be released, whether or not the petition should be continued or dropped, and I think that's very clear from the record. So it may well be the case that he's not responsible for medical judgments, but I don't think the argument is that he's responsible for medical judgments. The argument is that the fact that the prosecutor and only the prosecutor, that actually counsel, and he's a county official, suggests that this may be a public function, if you're going to hold somebody at least past the initial evaluation stage and the detention here persisted past the first, what was it? 72 hours or whatever the first period was, and then 14 days, but then it got into a longer period, and at some point, it can't be described as simply evaluation, why isn't the fact the law requires it to be the prosecutor that goes as counsel for somebody there itself suggests that this is a public function? Well, judge, I appreciate the question. Under Lee versus Katz, a state actor can be a state actor for certain purposes and certain roles and not others. And in this particular case, this is a civil law proceeding, and it's the Involuntary Treatment Act that provides that the prosecutor has any involvement, and so the fact that the prosecutor is interfacing with the court, interfacing with Mr. Rawson's attorney, doesn't change the essential function of my clients, who again, are evaluating and treating. They have no ability to order Mr. Rawson to be involuntarily committed. Only the court or the DMHP can do that. And whether they use the prosecutor because they were required by law, or whether they had used a private attorney if the law permitted it, which it doesn't, that wouldn't have changed their essential public function as far as the argument goes. But the fact that the law requires the prosecutor to be involved, doesn't that suggest that there is indeed a state function in this? You're talking about somebody being committed. I'm not talking about the medical part. We're talking about their actual commitment. He couldn't leave if he wanted to. The prosecutor has to be involved. The statute says he has to be involved. It can't be a private party. And you have the head physician of both facilities. One works for both the state and the private party. That's getting pretty close, isn't it, to somebody that's working for the state at least part-time? Well, respectfully, Judge, I don't think it's all that pertinent that our medical director had another job where he worked for another facility that was operated by the state, because that's- It's almost at the very same location, right? Well, it's not exactly the same location. As was pointed out earlier, it's a rental property on the grounds that's rented by my client as a private actor. As regards the attorney's involvement, again, under the same law, it's all under the ITA. Under the ITA, which requires in one section for the prosecutor to be involved on He also makes a very clear distinction between public and private parties and allows private parties to operate the evaluation and treatment facilities like my clients did. So the legislature- And yet you said a few minutes ago that the prosecutor had to be involved in what we had just been talking about. You couldn't use a private party. And he was involved in the most important thing of all, which is that he would be a part of the process of law. He's a state actor, is he not? The prosecutor? I would argue and submit- You're not employed by your client, are you? No, but as I said, Lee versus Katz, actors can have different functions and different roles depending on what they're doing. In this case, he's an advocate for my clients who are private party petitioners. Mr. Justice, why isn't this case controlled by Jensen versus Lane? Well, because, Your Honor, the Jensen situation, we have a public-private mental health team where there are public doctors and mental health professionals on a mental health team, along with the private psychiatrist, Dr. Robbins. There's nothing like that here. Mr. Nichols is not a doctor or a mental health professional. He's an attorney. He's an advocate. The other thing, and I wish I would have pointed this out in the brief, but Dr. Robbins signed an order under his own authority under an Oregon statute to have the plaintiff detained. None of my clients did something like that. They couldn't have done something like that. You said an Oregon statute was just not in Washington? I'm talking about Jensen now, Judge. Oh, yes. OK, got it. Dr. Robbins and Jensen was empowered under an Oregon law to enter an order to detain the plaintiff, and nothing like that happened here. Well, here you had this Clark County designated mental health professional. It sounds a little bit like Dr. Robbins. Dr. Robbins was a private contract psychiatrist who was under contract with the county hospital. In our case, the Clark County designated mental health professional was the person that came and saw Mr. Ross at the hospital in Clark County, which is hours away from our facility. We had no interaction with him. It's the process, though, that Jensen involves an Oregon process, we're talking about a Washington process, correct? There's not a big difference between these processes. I mean, the processes, in fact, around the country have striking similarities to one another. And here, the Ninth Circuit, in the Jensen case, talked about the complexities, the joint action, the close nexus. I see the same kinds of complexities here involving this situation. And I'm just asking, why isn't Jensen more controlling than what you seem to attribute to it? Well, because, Judge, again, in Jensen, there was a public-private mental health team that both weighed in on and were involved in the plaintiff's case. Here, we didn't have anything like that. We didn't have interaction with the Clark County DMHB. We didn't have, we weren't in a county facility. We were exercising independent. If they hadn't stepped forward and said, we think that Rawson should be committed for 72 hours under an involuntary commitment, Rawson would not have gotten to your facility. Correct? That's right. And, well, isn't that, it sounds to me like that's a public-private team that's very similar to Jensen. No, Judge, respectfully, no. There was, in Jensen, there was actual conferral between the public mental health facilities and public physicians and the private psychiatrists. Here, there was nothing like that. Well, with that respect, I mentioned this earlier, but in connection with the petition for the 90-day commitment, Dr. Hollemaier and French petitioned for an additional 90-day commitment, recommending the court involuntarily commit Rawson to Western State Hospital. They alleged that Rawson had, in quotes, threatened, attempted, or inflicted physical harm upon a person or property during the period of custody, but it turned out they didn't have any record of any such statements. Rawson exercised his right to a jury trial, which was continued multiple times while he remained involuntarily committed. In preparation for the trial, Dr. Hollemaier and French communicated extensively with the county deputy prosecuting attorney, who is the prosecutor, regarding discharge possibilities, current treatment methods, the strength of the evidence against Rawson, and the theory they argued to the jury. In the meantime, a court-appointed expert psychiatrist evaluated Rawson and concluded that he was not dangerous. His frustrations were not unreasonable, and he had no symptoms related to psychosis or a mood disorder. And so almost immediately thereafter, he gets released. Now, it seems to me that there's a lot of cooperation there between the government and the private party. Do you agree? I don't agree in any way that's material to the actions that we took that he's complaining about, because we can only operate and make recommendations based on our clinical judgments. The observations we have, as far as the record goes, Your Honor may have been reading from the district court decision, but on DeNova Review, we have a lot of notes and clinical records from our facility that suggest that he was threatening and that he was dangerous. I could. I'll take your time to ask one question. I'm going to ask your colleague the same question, which is what practical difference does this make? I understand that the complaint contains state law claims as well. Maybe it affects what court it's going to be in, but it can't be that this case is just about a 1983 claim. So is there a practical significance to whether there's a 1983 claim that survives? That's an excellent question. Mr. Rawson has state law claims pending right now in the Pierce County Superior Court. He has the potential for several remedies. Those claims center on expert psychiatrist disagreement about the nature of our judgments. So he has a remedy and he's pursuing that in Superior Court. You ask my opinion as to why it matters practically. It's because Mr. Rawson wishes to seek attorney's fees and punitive damages under Section 1983. That's the only practical reason why we're here. I'm sure I'll hear from your colleague on the same subject. Your opponent may. Great. Any other questions for Mr. Justice? Thank you. Mr. Ford, what's your response? You have a little rebuttal time. Thank you. And I'll start with Judge Clifton's question. It's true that attorney's fees and punitive damages are part of the issue, but also there are federal constitutional protections that are broader than those that are allowed by Washington common law, especially in terms of due process issues and in terms of confinement. So I think we have an important, of course, if the question is if it can state the strictures of the Civil Rights Act by privatizing these things. And that's really what I think this comes down to. Now, in terms of this question of Jensen, I agree that Jensen is the most important case for the first of their act containing of these orders. I would disagree. I think we have a lot of things that are very similar to Jensen, including this designated mental health, who was the source of the information that they used completely for the 14-day conviction and who also testified, Mr. Nichols and Dr. Holacar and Ms. Clingville, they all testified at the 14-day hearing. So the designated mental health professional is very much involved, just like in Jensen. But people who have the plus that they didn't have in Jensen, which is the prosecuting attorney being assigned. Why did the state do that? Is the state going to allow private lawyers to come in and do this? Private people to do this? No, it's too important. You're taking people's liberty away. You're voluntarily medicating them with very powerful medications that they don't want and getting their bodies. That is a function that only the state power can confer and the state wants to keep it under control, not just let it out. So it assigned these prosecuting attorneys to make sure that the law is followed and these folks work together by law. A council mentioned that there are private and public evaluation centers under this law, and that's true. Many of the ones are public and it really makes sense that somehow a person can find that the color of state law, when a court order puts them in a public facility rather than a private facility, it's the same function, the same public function of locking people up and treating them medically while they're locked up, whether they like it or not. Those are the same things that are happening to people in both of those kinds of facilities. And I think Jen Fisher mentioned that these things are very similar across the country. It's true. We have these short term evaluations where the courts have said that's not state action. And people can do that sometimes, at least Berkeley have done it sometimes. Once you get past the evaluation, Washington says 72 hours, I think Pennsylvania says 120 hours, Oregon said three days. Once you get past that period, you're not doing that kind of thing that is done by private people. You're doing the kind of thing that only the government does, which is locking people up and taking their liberty away by force of law. And that is a public function. And the way they got to it was with a public officer in a nexus, in a relationship that I don't think can be distinguished from Jen's. Unless the court has other questions. Any other questions? Thank you very much, counsel, for your argument. We appreciate it. The case just argued is submitted.
judges: Fisher, Clifton, M. Smith